**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

RED SKY COMMUNICATION, LLC et al.,

　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　Case No: 07-2069-DJW

CITY OF LENEXA, KANSAS,

　　　　　Defendant.

**MEMORANDUM AND ORDER**

This is an action for declaratory, injunctive, and mandamus relief pursuant to the Federal Telecommunications Act of 1996 (the "TCA").[1] More specifically, Plaintiffs Red Sky Communication, LLC, Verizon Wireless, LLC and T-Mobile Central LLC (collectively "Plaintiffs") allege that the decision of Defendant City of Lenexa, Kansas ("Defendant" or "City Council") to deny Plaintiffs' application for a special use permit to construct a wireless telecommunications facility violates the TCA in that (1) Defendant's denial fails to meet the "in writing" requirement of the TCA; and (2) Defendant failed to base its denial upon substantial evidence, as required by the TCA. The parties have filed cross-motions for summary judgment addressing both of these issues. For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment, find Plaintiffs' Motion for Summary Judgment moot in part, and deny the balance of Plaintiffs' Motion for Summary Judgment.

**Procedural History**

With regard to Plaintiffs' allegations pertaining to Defendant's failure to comply with the "in writing" requirement of the TCA, this Court issued a Memorandum and Order on January 22,

---

[1]47 U.S.C. § 332 (1996).

2008  finding that Defendant failed to set forth the reasons for denial of Plaintiffs' application in writing as required by the TCA.  Instead of summarily granting judgment in favor of Plaintiffs on this issue, however, the Court ordered Defendant to submit a (1) a written decision separate from the written record (2) describing the reasons for denying Plaintiffs' application with (3) sufficient explanation to allow a reviewing court to evaluate whether there is evidence in the record to support the stated reasons.  Defendant has submitted the written decision as directed and the Court is now ready to rule on the merits of the sole remaining legal issue: whether Defendant's denial of Plaintiffs' application for a special use permit to construct a wireless telecommunications facility violates the TCA in that Defendant failed to base its denial upon substantial evidence, as required by the TCA.[2]

### Summary Judgment Standard[3]

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[4]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5]  A fact is "material" if, under the applicable substantive law, it

---

[2]Because Defendant has submitted the written decision as directed, the Court will find Plaintiffs' motion for summary judgment moot as to that part of the motion that pertains to Defendant's satisfaction of the TCA's "in writing" requirement.

[3]Plaintiffs and Defendant both have filed motions for summary judgment. The Court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[4]Fed. R. Civ. P. 56(c).

[5]*Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).

is "essential to the proper disposition of the claim."[6]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]  To accomplish this, the facts "must be identified by

---

[6]*Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[10]*Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.

[11]*Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12]*Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (citation omitted).

reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13] Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[14]

### **Uncontroverted Facts**

1.     Red Sky is a Kansas limited liability company registered to do business in the State of Kansas.

2.     Verizon Wireless is a Delaware limited liability company registered to do business in the State of Kansas and has a registered agent located in the State of Kansas.

3.     T-Mobile is a Delaware limited liability company registered to do business in the State of Kansas and has a registered agent located in the State of Kansas.

4.     The City Council and Mayor constitute the governing body of the City.

5.     Defendant acts through the City Council and Mayor.

6.     City of Lenexa zoning regulations require the issuance of a special use permit for construction of a wireless communication tower in any zoning district, with the exception of "BP 2" zoning districts.

7.     City of Lenexa zoning regulations provide criteria for review of special use permits.

8.     Red Sky is the owner of an approximate 0.2169539-acre parcel of land in Johnson County, Kansas (the "Proposed Site") that is located near 19570 West 95th Street, Lenexa, Kansas

---

[13]*Adams*, 233 F.3d at 1246.

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

66215. The Proposed Site does not have a situs address and is part of Johnson County Parcel ID # IF231236-2022.

9.     There is an existing lighted guy wire tower on the Proposed Site (the "Existing Tower").

10.     Except for the Existing Tower, the Proposed Site is vacant.

11.     Johnson County District Court records indicate that the Existing Tower was constructed on the Proposed Site in 1979 by Robert Perry ("Perry").

12.     On November 21, 2005, Robert Herlihy of Selective Site Consultants, Inc., as agent for Red Sky, submitted a special use permit application (the "First Application") to Defendant to "replace existing 300' guyed tower with 190' monopole tower" (the "Proposed Tower") on the Proposed Site.

13.     On May 1, 2006, the Planning Commission considered the First Application.

14.     At the May 1, 2006 Planning Commission meeting, the Planning Commission continued the First Application to the June 5, 2006 Planning Commission meeting.

15.     At the June 5, 2006 Planning Commission meeting, Planning Staff recommended approval of the First Application for a ten-year period stipulated to include only one platform, a total height of 150 feet and specific buffering requirements, including a masonry enclosure as tall as the tallest equipment building. The Planning Commission approved the Planning Staff recommendation by a 6 to 3 vote.

16.     On June 15, 2006, the Planning Commission prepared a "Report to the Governing Body" regarding the First Application (the "June 15 Commission Report on the First Application").

17.     On June 20, 2006, the City Council heard and considered the First Application.

18.     During the City Council's meeting, Planning Staff discovered that it made an error in publishing notice of the public hearing held by the Planning Commission in the newspaper because the published notice stated that the Proposed Site was zoned "Ag, agricultural," but it is actually zoned "R-1, single-family residential."

19.     Due to the error in the published notice, the First Application was withdrawn.

20.     On June 28, 2006, Red Sky filed another special use permit application (the "Second Application") to "replace existing 330' guyed tower with 180' monopole tower" on the Proposed Site.

21.     The City Planning Office accepted the Second Application and scheduled it for a public hearing before the Planning Commission.

22.     At the time of the Second Application, the then-existing City Code Section 4-1B-24 classified wireless communication towers as accessory use structures and provided that an accessory use was not permitted on a lot until a principal use had been established.

23.     On July 31, 2006, the Planning Commission recommended denial of the Second Application for lack of jurisdiction pursuant to Section 4-1B-24 of the City Code on the basis that the Proposed Site was vacant, except for the Existing Tower, and thus did not have a principal residential use.

24.     On August 15, 2006, the City Council dismissed the Second Application for lack of jurisdiction.

25.     On September 19, 2006, the City Council passed Ordinance No. 4893, which amended City regulations with respect to classification of wireless communication towers.

26. On October 31, 2006, attorney Curtis Holland, as agent for Plaintiffs, submitted a special use permit application to the City to "replace existing 330' guyed tower with 180' monopole for use by Verizon Wireless and T-Mobile" on the Proposed Site (the "Third Application").

27. Along with the Third Application, Plaintiffs submitted, among other things: vicinity maps of the area; an aerial map of the parcel and surrounding area; a USGS topographical map of the parcel and surrounding area; photo simulation of the proposed tower with co-locators' affidavits regarding compliance with FCC, FAA and other government regulations; Verizon's Radio Frequency Engineer's Report regarding Coverage Objectives for Proposed Tower Site including Propagation Studies of that portion of the City of Lenexa with and without the Proposed Tower shown; T-Mobile's Radio Frequency Engineer's Report regarding Coverage Objectives for Proposed Tower Site including Propagation Studies of that portion of the City of Lenexa with and without the Proposed Tower shown; site plan drawings; and articles relating to consumer usage and property value concerns.

28. Planning Staff submitted a Staff Report for the December 4, 2006 Planning Commission Meeting ("December 4 Staff Report").

29.     The December 4 Staff Report set forth Planning Staff's comments "with regard to the review criteria contained within Section 4-1G-5" (also known and referred to as "the Golden Criteria") of the City's Code as follows:

*1.     The character of the neighborhood.*

As noted above, the character of the neighborhood is changing. The 50 lot Enclaves subdivision is under development to the west. Establishment of a new monopole would be a determent to further additional, quality residential development.

*2.     The zoning and use of properties nearby.*

See above.

*3.     The suitability of the subject property for the uses to which it has been restricted.*

The Comprehensive Plan proposes low and suburban density residential uses for this area.

*4.     The extent to which the proposed use will detrimentally affect nearby property.*

This proposal will have the most impact on the immediate adjacent neighborhood. Obviously, the neighborhood has lived with the existing radio tower for quite some time. At the time of the original application, Staff believed the guy wire tower was legally nonconforming and that swapping the old tower out and replacing it with a shorter monopole tower would be viewed as a positive. Now that we have determined that the guy wire tower was not legally approved, this 'trade off' is no longer a valid consideration. This application must be viewed as if the guy wire tower does not exist. As such, a new 180 foot monopole at this location will have substantial visual impacts on adjacent properties.

*5.     The length of time the subject property has remained vacant as zoned.*

Annexed in 1986, this property was agriculturally zoned until the City approved a rezoning to R-1 single family in June of 2000. The approved zoning plan at that time reflects single-family lots and removal of the guy wire tower.

6.  *The relative gain to public health, safety and welfare due to the denial of this application as compared to the hardship imposed upon the landowner, if any, as a result of denial of the application.*

Staff previously hoped that some impacts of the current location would be lessened with replacement of the guy wire tower with a shorter monopole. Now that the legality of the guy wire tower is in question, Staff sees no gain to the public welfare in approval of this request. Removal of the guy wire tower will be a separate enforcement issue.

7.  *Recommendations of City's permanent professional staff.*

See staff recommendation section.

8.  *Conformance of the requested change to the adopted or recognized Master Plan being utilized by the City.*

The intent of the procedure for Special Use approvals for cell tower locations is to ensure that tower sites are reviewed individually and site specific. They should have reasonable safety and aesthetic safeguards in place and restrictions should not be so heavy handed as to preclude wireless service to the community. The area is master planned for single family land uses, and the visual impacts of a new monopole at this highpoint topographically for the area, would be at odds with the plan.

9.  *The availability and adequacy of required utilities and services to serve the proposed use.*

Major utilities are existing or nearby.

10. *The extent to which the proposed use would adversely affect the capacity or safety of that portion of the street network influenced by the use, or present parking problems in the vicinity of the property.*

The approval of this Special Use permit will not adversely impact the area's existing street network.

11. *The environmental impacts the proposed use will generate including, but not limited to, excessive storm water runoff, water pollution, air pollution, noise pollution, excessive nighttime lighting or other environmental harm.*

Development of any kind will generate additional storm water runoff and some additional light and noise pollution. There will be some impacts created by this proposal; however, proper site planning should mitigate most of these impacts.

9

> 12.   *The ability of the Applicant to satisfy any requirements (e.g. site plan, etc.)
> applicable to the specific use imposed pursuant to the zoning regulations in this
> Chapter and other applicable ordinances.*

The UDC requires that, in residential settings, an architecturally compatible solid screen wall
is provided to screen all ground equipment. Staff has agreed that this wall could be deferred
until such time as the adjacent properties develop, but will require that it be installed at that
time. The Applicant has not addressed our request for written acknowledgment that as
adjacent properties develop[,] they would commit to upgrade the fenced compound with an
architecturally compatible solid wall enclosure.

It is also important to note that this is not a legally sized lot, in that it does not have adequate
lot frontage, which would preclude the issuance of a building permit on the lot pursuant to
Section 4-2B-7 of the City Code.  While staff does not support the requested SUP, any
recommendation of approval should be contingent upon the applicant obtaining a variance
of the lot frontage requirement. Staff believes that it will be difficult for the applicant to
obtain such a variance given that the applicant created the illegally sized lot through its sale
of the remainder of the property …

In summary, any approval of this application must be contingent upon:(1) obtaining a lot
width variance; (2) future solid architectural wall installation triggered with adjacent
property development; (3) provision of access easements to the leased tenants providing for
access to 95th Street; and (4) providing additional plan details prior to building permit
issuance. See Exhibit B at pp. 2-4.

30.   The December 4 Staff Report also set forth Planning Staff's "Special Use

Recommendation" as follows:

As reflected in attached minute records and previous staff reports, with the original Red Sky
application, Staff relied upon the erroneous assumption that the current guy wire tower was
a legal non-conforming structure and viewed its switch out with a new smaller monopole a
step in the right direction. Now that we have information to the contrary, we cannot evaluate
this application as if the current guy wire tower exists or view the present applicant as an
alternative to a less desirable tower. As such, Staff does not believe that this site specific
location is appropriate for the requested tower both because of its impact on neighboring
properties and because of the other plan requirements – detailed above – that would have to
be addressed, if approved. The Applicants should seek out other locations in the area that
would have fewer impacts to the adjacent community. While staff does not doubt the need
for better wireless service for this area, we do not believe that this is the right location for
a monopole. Based upon analysis of the Golden criteria set forth above, Staff recommends
DENIAL of this application. However, as noted above, if the Planning Commission is
inclined to recommend approval of the application, any recommendation for approval must
be contingent upon:(1) obtaining a lot width variance; (2) future solid architectural wall

installation triggered with adjacent property development; (3) provision of access easements to the leased tenants providing for access to 95th Street; and (4) providing additional plan details prior to building permit issuance.

31.     On December 4, 2006, the Planning Commission held a meeting (the "December 4 Planning Commission Meeting") at which it considered the Third Application.

32.     At the December 4 Planning Commission Meeting, Gil Pintar, the Development Review Administrator, stated, as reflected in the minutes:

> They do not have a problem in terms of the issue of coverage gap that [the Applicant] talks about. The propagation maps, the mapping that they have supplied does show this area needs additional coverage. That is not the issue. Obviously, there is a coverage issue but it is all about finding the right site.

> [T]he recommendation for the previous application is that staff relied upon the erroneous assumption that the current guy wired tower was a legal nonconforming structure. Staff viewed its switch-out with a new smaller tower as a step in the right direction. Now that staff has information to the contrary, we cannot evaluate this application as if the guy wire tower exists.  Basically, we are viewing this application as a new application as if the guy wire tower does not exist. It is not a switch out. In terms of a land use action that is staff charged with, staff is not viewing it that way. Yes, staff's position has changed. Staff has asked them as owners of the property of the tower to supply staff with documentation for approval of the current guy wire tower. They have not done so. The tower did not have approval therefore it is being viewed as a new land use.

> [Based on] the Golden Criteria, this is a highpoint for this site specific proposal. It is very high profile that can be viewed for some distance. It is all Master Planned for residential not commercial or industrial. Staff believes there will be visual impacts. The Golden Criteria provides that this area should not be supported for a special use permit.

33.     There was a public hearing at the December 4 Planning Commission Meeting.

34.     Mark Epstein, an attorney representing a number of "adjacent home owners," testified in opposition to the Third Application, stating, as reflected in the minutes, in pertinent part:

> A 320 foot or a 180 foot tower is not in keeping with the character of the neighborhood.  Mr. Epstein asked if it is some kind of benefit to the community, the answer to that is no. Is it suitable for which the use has been restricted? No, it has been restricted to an R-1 use and the choice to make it an R-1 use was the landowner who is now applying for the SUP for the tower, the same person who rezoned it to R-1. Now you have a situation where they have

11

rezoned the property, at some point on preliminary plan promised to remove the [existing] tower, and now some six years later they have come back with their illegal tower and tried to play the three card monte: that they are going to trade their illegal tower for a more legal tower on property that was not supposed to have a tower to begin with. Does it conform to the adopted Master Plan? No. Is there relative gain to the public health? Staff sees no gain to the public welfare in the approval of this request. Removal of the guy wire tower will be a separate enforcement issue. While the applicant tries to focus your attention on whether or not they are going to fix a gap in coverage, Mr. Epstein wants to focus the attention on the fact that this is not an appropriate use of the land. The fact that staff supported the application in the past is irrelevant and not germaine [sic] to tonight. Staff supported the request in the past based on misinformation. Now that staff has the correct information, i.e.[,] the existing tower never should of have been there changes the entire focus from a swap, to this is the first time you are seeing an application and you have to imagine in your own mind that there is nothing there. It is simply a vacant, one-acre tract surrounding on all sides by R-1 residential with a brand new development to the west, the Enclave. . . you have to look at that property as though no tower is there, because, no tower should be there.

35.     Attorney Epstein was the only person who spoke in opposition to the Third Application; at no time did he mention, or present evidence of, any visual impact of the Proposed Tower or any claimed determent to further residential development.

36.     According to the December 4, 2006 Planning Commission Meeting minutes, Commissioner Karlin "asked with regard to item six of the Golden Criteria as a new application, was documentation submitted or, if so, would it be necessary for documentation [to] be submitted to show this area lacks cell phone coverage and this is the spot that it needs to be to qualify under item number six of the Criteria."

37.     In response to Commissioner Karlin's question, the Development Review Administrator explained that:

the propagation maps that were discussed show areas where there are drop zones, where an area is not as good as it could be. The mapping does not zone in or focus on one specific property. It is an area mapping document that shows coverage for a larger vicinity. As Mr. Holland presented in his original statements, there is bad coverage all the way to K-7 to 83rd Street to K-10. There is a large area that is impacted by the fact that there is a need for additional coverage in the area.

38.     The minutes indicate that Mr. Holland explained that they

had talked about moving the tower to the north on the property. He points that some residents are going to see the communication tower, because there are going to be houses built there, presumably, then they are going to see it if you put it up there. He stated the ground drops off as you go to the north. They looked at moving it to the north, they had a proposal by the Orlando's [sic] that they would consider a land swap if it were moved to the north. It was looked at by both of the carriers and it did not work very well for T-Mobile's location by just moving it a couple of hundred feet to the north, getting it out of the perimeter. He also stated in that regard, there was another property owner out there by the name of the Beezley's [sic]. They did not like that; they did not want it to move closer to them. You have these factions that disagree as to where the appropriate location for the tower relocating where nobody would complain. . . . He stated that [the] community has grown up around the communication tower. It did not seem to bother Falcon Ridge.

39.     Mr. Holland next explained that "even though the coverage area might be miles that does not mean you have miles to move the tower. The tower still has to be in a specific geographic area because you are not just looking at that particular coverage area but all of the other facilities that you have around there and making the site interface with your other sites."

40.     The minutes reflect that Commissioner Weimer then asked "why could the tower not be moved 200 feet that someone recommended and put on additional height and get it to work that way?"

41.     According to the minutes, in response Mr. Holland stated it would take the cooperation of others to make that work. For example, that would take the Orlando's [sic] and so far they have not been ready, willing and able to step up and show us where there is a spot on their property. He stated they have had communications and Mr. Holland communicated with Mr. Epstein two months ago and asked if the Orlando's [sic] were interested in a land swap and has not heard back from them. He stated they have done what they think they can.

42.     At the December 4 Planning Commission Meeting, Planning Staff recommended denial of the Third Application. The Planning Commission, however, recommended approval of the Third Application by a vote of 5 to 3.

43.     On December 14, 2006, the Planning Commission prepared a "Report to the Governing Body" regarding the Third Application (the "December 14 Commission Report"), in which the Planning Commission recommended that the City Council approve the Third Application.

44.     The December 14 Commission Report, like the December 4 Staff Report, described the "Comprehensive Plan Recommendation for Area" as "Low density and suburban residential land uses."

45.     The December 14 Commission Report (as did the December 4 Staff Report) also contained the following information:

VICINITY ZONING PATTERN:                    VICINITY LAND USE PATTERN:

North: R1, Residential Single-Family        North: Agricultural, rural-residential
South: AG, Agricultural                     South: Agricultural & Single-Family
                                            residence

East: R1, Residential Single-Family         East: Agricultural, rural residential
West: RP-1, Planned Residential Single-Family   West: Agricultural, Future "Enclaves"

46.     Like the December 4 Staff Report, the December 14 Commission Report described the "General Neighborhood Characteristics" as: "The recently approved 50-lot Enclaves at Woodland Lakes lies to the west of this ownership and the immediate site is mostly large lot, rural residential in nature. The area along Woodland Road consists of low-density residential communities."

14

47.    The December 14 Commission Report adopted the analysis of "the review criteria contained within Section 4-1G-5 of the UDC", or the Golden Criteria, contained in the December 4 Staff Report.

48.    In its December 14 Commission Report, the Planning Commission repeated Planning Staff's "Special Use Recommendation" contained in the December 4 Staff

49.    However, the Planning Commission, as reflected in the December 14 Commission Report, recommended approval of the Third Application (just as it had in the June 15 Commission Report on the First Application).

50.    On December 19, 2006, the City Council heard and considered the Third Application.

51.    At the beginning of the December 19 City Council meeting, Planning Director Kroh, as reflected in the meeting minutes, explained that at the time Planning Staff recommended approval of the First Application,

> staff had assumed that the 330' guy wire tower, that currently exists, was a legal, non-conforming tower and that the replacement of it with the 165' monopole would be beneficial to the area . . . Since that time staff has also researched the legality of the original guy wire tower. The tower was erected in 1979 without the approval of the Board of County Commissioners and the Monticello Township Zoning Board. At the time it was erected it was under County jurisdiction, not City jurisdiction. A lawsuit followed and was dismissed. Deputy City Attorney, Beccy Yocham[,] will address that.

52.    The Deputy City Attorney then addressed the City Council, and the meeting minutes reflect as follows:

> [The Deputy City Attorney] stated there was some question at the Planning Commission level because at the time of the Planning Commission meeting we had not seen any of the documents associated with the lawsuit that concerned this tower. Since that time, we have received a copy of the entire lawsuit from County Archives. She stated the tower was constructed by Robert Perry in 1979. In May of 1981, he went before the Monticello Township Zoning Board to request a Special Use Permit to ratify the construction of the tower that occurred two years earlier. The motion to recommend approval of the special use permit failed by a vote of 1-4. It then went to the Board of County Commissioners a few

15

weeks later with a recommendation of denial from the Monticello Zoning Board. The Board of County Commissioners passed Resolution 47-81 denying the permit. [The Deputy Attorney] stated she had a copy of the May 6, 1981 Monticello Township Zoning Board minutes as well as the BOCC Resolution 47-81 and the Board of County Commissioners minutes of Thursday, May 28, 1981.  She entered these into the record.  In June of 1981, Robert Perry sued the BOCC on the denial claiming that their denial was arbitrary and capricious. The BOCC counterclaimed for an injunction to have the tower removed. Litigation ensued with some discovery and other items going on for about a year thereafter. In October of 1982 it appeared from the docket sheet that they were nearly ready for trial. They had agreed to bifurcate the two trial issues – one being the validity of the Monticello Township Zoning Board regulations and the other being the reasonableness of the Boards [sic] action. They briefed the issues and it appeared that they were ready for trial. There was no further action on the case until July 1984. Between July 1984 and July 1986 the case bounced around and was reassigned to three different courts during that time and [in] September of 1986 the case was dismissed without prejudice for lack of prosecution. That means that nobody did anything on it for a long period of time and the court, out of judicial economy, can sometimes dismiss cases for that purpose. That is what happened to this case. Nobody ever re-filed the case. Mr. Perry could not have re-filed as he was out of time to do so. The BOCC did not and we can assume that was because it was about that time when this area was annexed into the City of Lenexa and it was no longer a zoning issue that concerned the BOCC. It became our issue and at the same time the case was dismissed and nobody ever re-filed. For those reasons it is her opinion that [the Existing Tower] is an illegal tower.

53.    According to the minutes, Planning Director Kroh then stated that:

the long existence of the tower was an important factor in the initial recommendation [of] staff to support the monopole. Having learned that the tower was not approved by the BOCC, staff felt they needed to look at this as a new application and as if the guy wire tower had never been built. Staff did not feel that they could recognize the existence of the guy wire tower being that it was never legally approved. That is why this came before the Planning Commission and the City Council with a recommendation of denial.

54.    Mr. Holland, on behalf of Plaintiffs, addressed the City Council, as reflected in the minutes, and submitted radio propagation maps to show the need for the Proposed Tower and explained Verizon Wireless' propagation map and T-Mobile's propagation map.

55.    As the minutes reflect, Mr. Holland also "produced another map showing the existing lighted guy wire tower and it also showed the surrounding development in the area."

16

56.     Mr. Holland also explained that "[t]here are no other communication towers within 2 miles of this site."

57.     According to the minutes, Mr. Holland also stated:

One of the benefits of having the new communication tower placed in this location is the fact that it has already been used for a communication structure for nearly 30 years. When you speak to the character of the neighborhood and the familiarity of having a communication structure in the area, they have a significant history here. Regardless of whether it was built legally or illegally, that tower has been there for nearly 30 years and the neighborhood has gotten used to it and has grown up around it. The neighborhood has developed or is developing with full knowledge [of] the communication structure being there. To argue that it is a detriment to development seems tenuous.

58.     The minutes reflect that Mr. Holland also pointed out that:

[t]here has not been any negative effect in that area because of the tower. Developers bought the land to the west fully knowing that the tower was there. They had no idea that the tower was illegal. They did not know that it was eventually going to come down. Their plan was to build a subdivision there and they did not think there was a problem building it next to the tower.

59.     Mr. Holland then "asked the City Council to consider that the Comp[rehensive] Plan has always shown this area to be residential."

60.     The minutes reflect that City Councilmember Sullivan asked about an alternate location for the Proposed Tower "in the northeast corner."

61.     Mr. Holland responded to this inquiry, as reflected in the minutes:

Mr. Holland stated in the prior application there was talk about moving the tower and a land swap was to take place with Mr. Orlando. It was suggested to move it to the periphery of the Orlando property. They did go out and look at the proposed location and talked specifically to the Beezley's [sic] and they did not like the tower being closer to their home. There was no real definite proposal to move it in terms of the actual specific land where it would be located, what the terms of the swap would be, etc. If you move the tower to the north you start to fall off in grade to about a 40 foot difference. If you go down then you have to go taller with the tower structure and if it goes over 200 feet it has to be lit. . . .Mr. Holland stated he spoke with Mr. Epstein who represented the surrounding property owners, asking if there was any interest in doing a swap and he did not get a response on that particular issue.

62.     According to the minutes, Mayor Boehm asked if the Planning Commission was privy to the information about the timeline and the lawsuit relating to the Existing Tower.

63.     In response, the Deputy City Attorney stated that:

staff did not know the level of detail that was presented tonight. They were aware that it had been before the Monticello Zoning Board and the BOCC and that it had been denied and was aware that litigation ensued after that. But, staff had not obtained copies of the lawsuit. Staff knew it was dismissed for lack of prosecution but did not know what the basis of the lawsuit was or the timing of the dismissal or the fact that it coincided with the annexation of the property into Lenexa. They knew some of what was stated tonight but not the level of detail.

64.     As reflected in the minutes, Mayor Boehm then asked "if this issue needs to be remanded to the Planning Commission on that issue alone because that is a significant piece of information that the Planning Commission did not have knowledge of when they had their discussions and vote."

65.     In response, the minutes indicate the Deputy City Attorney "stated they could remand on the basis of this new information. She does not necessarily think that it has to be remanded on the basis of this information. The fact that the City Council has more information than the Planning Commission had alone does not necessitate that it be remanded."

66.     The minutes reflect that at the December 19 City Council Meeting, Councilmember Linver "stated she could support [the Third Application] tonight but she also supports the remand."

67.     The minutes reflect that nobody spoke in opposition to the Third Application at the December 19 City Council meeting.

68.     On December 19, 2006, the City Council remanded the Third Application to the Planning Commission.

69.     On January 8, 2007, the Planning Commission reconsidered the Third Application (the "January 8 Planning Commission Meeting").

18

70.     As reflected in the minutes for the January 8 Planning Commission Meeting, the Deputy City Attorney said:

> she was able to obtain a copy of the lawsuit concerning the existing tower. At the last Commission meeting, discussions noted that there had been a lawsuit on this tower, but Staff did not have any details. She had since obtained the lawsuit file and shared information with the Governing Body . . . Based upon the information in that file, she gave the legal opinion that the tower was not legally non-conforming and is illegal and has been illegal since its construction. The Governing Body felt this was new information that the Planning Commission had not been aware of and therefore [ ] they remanded the application to the Planning Commission for review in light of this additional information.

71.     The Deputy City Attorney then recounted the litigation history between Perry and the Johnson County Board of County Commissioners and advised the Planning Commission that it was her opinion that the Existing Tower "was illegal when it was construction and it is still illegal today" and "that a person cannot acquire zoning rights by adverse possession so the fact that it has been there 20 years does not grandfather it into compliance or enable it to acquire any special rights or legal status."

72.     Chairman Oppliger then "cautioned everyone that this item has already been heard by the Commission and all the exhibits read. Now the Commission has the opportunity to reconsider their vote based on this information."

73.     Although the January 8 Planning Commission Meeting was not a public hearing, the Planning Commission took public comments "on the issue of the remand and any new information discussed this evening."

74.     Attorney Epstein spoke as a representative of "a number of neighbors in the vicinity of this new application."

75.     The minutes indicate that Attorney Epstein spoke, in part, as follows:

Mr. Epstein indicated that now that the Planning Commission knows the truth of how this thing got there they have an opportunity, on remand, to do the right thing. We respectfully request you send a recommendation of denial back to the Governing Body based on this new information and send the message that this is not the way we do business in the City of Lenexa.

76.     Nobody other than Attorney Epstein spoke in opposition to the Third Application.

77.     Planning Director Kroh explained: "It is up to the Planning Commission to determine if the new information warrants a change in their recommendation or if they wish to stay with their original recommendation [of approval]."

78.     During the Planning Commission's discussion, the minutes reflect that Chairman Oppliger explained that "[h]is own original comments were such that he supported the request. But, with the new information that zoning rights cannot be acquired by adverse possession, his opinion has changed."

79.     According to the minutes, Commissioner Allenbrand "advised that she would also be changing her vote [because] [s]he felt this was built illegally and does not follow the Golden Criteria."

80.     Then Commissioner Reichmeier "indicated he was in favor of this site before as it was brought to the Commission with an existing tower and with the understanding that the new tower would improve existing conditions and not be as much of an eyesore. Since the existing tower is illegal, and in light of the neighborhood concerns he would be voting against this remanded item."

81.     The minutes reflect that Commissioner Karlin "indicated he made a comment last time stating that if the facts came back that this tower was conforming he would look at changing

his vote but the new information proves just the opposite. Therefore, he would be voting against this request."

82.     Commissioner Hoffman indicated he "would vote in favor of the application," and the minutes reflect that he stated:

> We have two sets of recommendations from the staff, the first based on Golden Criteria that recommended approval. We have another set with no change in the criteria except some ancient history being pointed out with a recommendation for denial. We are not asked to be judge and jury to determine what happened 20 years ago. This tower has been in the City for 20 years and most of the residents bought their property with this tower in place. This, as he said last time, is a land use question not a determination of legality of previous actions. . . . In his opinion, there is a need for wireless communication facilities in the western part of Lenexa. This location has been proven to us to be a prime location for wireless communication.

83.     The Planning Commission recommended denial of the Third Application by a vote of 6 to 3.

84.     The Planning Commission prepared a "Report to the Governing Body" dated January 11, 2007 (the "January 11 Commission Report") and submitted by Chairman Oppliger, recommending that the City Council deny the Third Application.

85.     The January 11 Commission Report set forth, in part, the following for "Project Status and Staff Recommendation:

> The above special use permit application for Red Sky Communications was heard by the Governing Body on December 19th. While a protest petition was submitted, it did not contain sufficient property owner signatures within 200ft of the leased boundary to trigger a super majority vote of the Governing Body. Upon consideration of this request, and as reflected in the minute record, the Governing Body's action was to remand the matter back to the Planning Commission for consideration of additional information presented to them that evening. On January 8th, at the request of the Governing Body, the Deputy City Attorney presented the additional information to the Planning Commission regarding past litigation with the existing tower on 95th Street east of Woodland. The Commission did not reopen the public hearing but did take additional public comment on the issue of remand only and any new information that evening. As reflected in the attached minute record the

Commission discussed this application in detail and is now forwarding a recommendation of denial.

86.     The January 11 Commission Report did not contain a new analysis of the Golden Criteria.

87.     On January 16, 2007, the City Council denied the Third Application by a vote of 6 to 1.

88.     Attorney Epstein, representing adjacent property owners, voiced, in part, the following opposition:

> The facts are that the tower was built illegally, has been illegal for almost thirty years and should not have been there in the first place. The application for a smaller tower does not make it any more acceptable or legal. It should not be there. This is the City's opportunity to rectify this situation.

89.     Robert Ford, an individual who has resided at 19757 West 95th Street since 1970, spoke against the approval of the Third Application, as reflected in the minutes: "He stated that if he had known it was built illegally when it was constructed, he would have voiced his disapproval at the time."

90.     Linda Beezely (9255 Woodland Road), Richard Carrothers (19200 West 95th Street), Jim Rhodes (19705 West 95th Street), and Glen Mock (the developer of the Enclaves at Woodland Lakes) were all present and spoke in opposition to the Third Application, and as reflected in the minutes:

> They all referred to the fact that they were told that when the area was developed the tower would be coming down. They were against it based on the aesthetically unpleasant view it presents to the area and that fact that all of the information presented at this evening's and other previous meetings proves that it is an illegal tower and encouraged the Council to deny the Special Use Permit for the new monopole tower.

91.     At the City Council meeting, Planning Director Kroh stated:

The fact is that evidence shows the tower was erected illegally as the landowner was denied a special use permit and was told to remove the tower by the County. A lawsuit was filed by the land owner against the County but was eventually dismissed for lack of prosecution. The tower is still illegal.

92.     The Deputy City Attorney stated that "the files on the lawsuit pertaining to this tower were obtained from the Johnson County Archives and clearly state [ ] the tower is illegal. The issue at hand is the appropriateness of the location of this tower on this land and that fact weighed heavily on the recommendation made by the Planning Commission and Staff."

93.     Councilmember Linver stated that "based on several of the Golden Criteria and her agreement with Planning Commission Chairman Oppliger's opinion, she will vote against the Special Use Permit."

94.     Councilmember Sullivan questioned if the Proposed Tower "could be moved to the extreme northeast corner of the property."

95.     Larry Louk of Selective Site Consultants, Inc. answered that a tower could work there but there has been no interest in moving it to that location.

96.     Councilmember Sullivan then indicated "he would vote against the Special Use Permit."

97.     The minutes reflect that Councilmember Huckaba stated he "agrees with Planning Commission member Horine's comments in the report that state the tower has been there for 30 years and it has served the public well [and that] [h]e does not feel that this tower is detrimental to the neighborhood and stated he would vote in favor of the Special Use Permit."

98.     Councilmember Green "concurred with Councilmember Linver's comments concerning the Golden Criteria but was also concerned about the fact that it has always been illegal and stated she would vote against the Special Use Permit."

99.    The minutes reflect that Councilmember Nolte stated: "[w]hat it comes down to is the appropriateness of a tower in this location and according to the Golden Criteria, he cannot support this application."

100.    Mayor Boehm stated that "current Code discourages towers in R-1. We would need to have dialogue to change our Code if we would desire that. There are commercial areas out there that would provide for cell towers which are allowed by our Code. Concerning the application before us, if it was presented to us with a blank slate, then according to the Golden Criteria it would not be approved for this site."

101.    The minutes reflect that none of the City Council members commented on the generalized aesthetic concerns raised by those residents who spoke in opposition to the Third Application.

102.    The City Council's denial of the Third Application is the final action on the Third Application, and it is subject to appeal.

103.    In response to this Court's Order dated January 22, 2008, Defendant submitted a written decision, separate from the written record, setting forth the following basis for denial:

C.    Basis for Denial

1.    The City of Lenexa, Kansas, legislatively adopted an ordinance setting out the procedure and basis for review in considering Special Use Permit applications.  These criteria are set forth in Lenexa City Code §§4-1G-5 and 4-1G-6.

2.    With respect to the Special Use Criteria set forth in Lenexa City Code §§4-1G-5 and 4-1G-6, the Governing Body concludes as follows:

a.    *The character of the neighborhood.*

The neighborhood is primarily large lot, rural residential in nature. [Lenexa City] Code §4-1B-23EE sets forth the supplementary use regulations

24

applicable to wireless communication towers, indicating that sites for new installation of towers are encouraged to be as compatible as possible with surrounding land uses by avoiding locations in or near residential areas. The Governing Body finds that the Application is not compatible with surrounding land uses and does not avoid residential areas in accordance with the Code.

b.      *The zoning and use of properties nearby.*

The property nearby is primarily zoned for single family or agricultural uses. As indicated above, the Governing Body finds the Application to be incompatible with such zoning and uses.

c.      *The suitability of the subject property for the uses to which it has been restricted.*

The subject property is zoned R-1 and is master planned for low and suburban density uses. The Governing Body finds the subject property is better suited for such uses than for the construction of a wireless communication tower.

d.      *The extent to which the proposed use will detrimentally affect nearby property.*

The Governing Board finds that the Application would have negative visual impacts on the nearby property.

e.      *The length of time the subject property has remained vacant as zoned.*

The subject property was agriculturally zoned until the City approved a rezoning to R-1, single family residential, in June of 2000 as a part of a preliminary plan for single family development that included the subject property and indicated removal fo the existing guy wire tower. Except for the existing guy wire tower, the subject property has remained vacant since its annexation.

f.      *The relative gain to the public health, safety and welfare due to the denial of this application as compared to the hardship imposed upon the landower, if any, as a result of denial of the application.*

The Governing Body finds that City regulations concerning the placement of wireless telecommunication towers do not unduly restrict or preclude the provision of wireless communication services and are intended

25

to place reasonable safety and aesthetic regulations on the placement of such facilities.  The Applicants have indicated that the proposed sit is the only site which serves the needs of both T-Mobile and Verizon Wireless together, but that other sites could serve the carriers individually.  Therefore, denial fo the Application will not have the effect of precluding wireless communication services and the gain to The public health, safety and welfare through denial fo the Application, which is at odds with City regulations, outweighs the hardship imposed upon the landowner.

g.      *The recommendations of the City's permanent professional staff.*

The City's professional staff recommends denial of the Application. The Governing Body recognizes that on prior, nearly identical applications, the staff recommended approval.  However, the Governing Body finds that this change in recommendation was justified based upon the City's reconsideration of the Golden Criteria in light of staff's confirmation of the illegal status of the existing tower.  The Governing Body further finds that the burden to prove that the existing tower is legally nonconforming is on the Applicant and that the Applicant has failed to prove this and, in fact, has presented no evidence whatsoever as to the status of the existing tower.  The only evidence on the status of the existing tower was provided by City staff and the Governing Body is persuaded by such evidence that the existing tower is, in fact, illegal.

h.      *Conformance of the requested change to the adopted or recognized Master Plan being utilized by the City.*

The master plan indicates single-family uses for the area.  The Governing Body finds that a new monopole tower at the proposed site (which is , topographically, a high point in the area) is at odds with the master plan.

26

i.      *The availability and adequacy of required utilities and services to serve the proposed use. These utilities and services include, but are not limited to, sanitary and storm sewers, water and electrical service, police and fire protection, schools, parks and recreation facilities, etc.*

The proposed site is adequately served by utilities and services.

j.      *The extent to which the proposed use would adversely affect the capacity or safety of that portion of the street network influenced by the use or present parking problems in the vicinity fo the property.*

The Application would have no impact on the capacity of safety of the street network and would present no parking problems.

k.      *The environmental impacts the proposed use will generate including, but not limited to, excessive storm water run off, water pollution, air pollution, noise pollution, excessive nighttime lighting or other environmental harm.*

The Application would generate no negative environmental impacts.

l.      *The ability of the Applicant to satisfy any requirements (e.g., site plan, etc.) Applicable to the specific use imposed pursuant to the zoning regulations in this Chapter and other applicable ordinances.*

Section 4-1-B-23EE(6) of the Lenexa City Code requires an architecturally compatible solid screen wall surrounding equipment cabinets and other ground-level equipment associated with wireless communication towers in residential areas. The Governing Body finds this requirement to be applicable to the Application and further finds that the Applicants have not agreed to provide such screening as required by City Code. The Governing Body finds the proposed site is not a legally sized lot because it does not have adequate lot frontage as required by Lenexa City Code. Therefore, before a building permit could be issued on the lot, the Applicant must obtain a lot width variance from the board of zoning Appeals. The Governing body finds that in order to grant a variance, the Board of Zoning appeals must find that the six (6) conditions set forth in 4-1-K-4 of the City Code are all met, including but not limited to, a finding that the condition is not created by an action of the property owner or the Applicant. Based upon the testimony of the Applicant/property owner that the lot was created by the sale of the remainder of the property, the Governing Body finds that it will be difficult for the Applicant to obtain a variance.

27

<u>Analysis</u>

**A.     The Federal Telecommunications Act of 1996 ("TCA")**

Congress enacted the TCA to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies.[15] Congress intended to promote a national cellular network and to secure lower prices and better service for consumers by opening all telecommunications markets to competition.[16] One of the ways in which the TCA accomplishes these goals is by reducing impediments imposed by local governments upon the installation of wireless communications facilities, such as antenna towers.[17] The TCA does not, however, abolish all local authority. It tries to balance its goals with the preservation of some local authority over land use.  Put simply, the TCA "attempts to reconcile the interests of consumers and residents (many of whom are themselves cell phone users)."[18]

The TCA places six restrictions on the authority of local government to regulate the placement, construction, and modification of personal wireless service facilities.[19] Only one of these restrictions is at issue in this case: "Any decision by a local authority denying a request to place, construct, or modify a personal wireless facility must be supported by substantial evidence contained in a written record."[20]  To that end, Plaintiffs' claim in this lawsuit is that the City Council's decision

---

[15]*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).

[16]*Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir. 2002).

[17]*Abrams*, 544 U.S. at 115.

[18]*Second Generation*, 313 F.3d at 631.

[19]*U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow*, 340 F.3d 1122, 1132-33 (10th Cir. 2003) ("*Broken Arrow*") (citing 47 U.S.C. § 332(c)(7)(B)).

[20]47 U.S.C. § 332(c)(7)(B)(iii).

to deny their request for Special Use Permit is not supported by substantial evidence and thus violates the TCA.

**B.     The Substantial Evidence Standard**

Under 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." It is well-settled that judicial review under the substantial evidence standard is quite narrow.[21]  That said, the Court's review, though highly deferential, is not a rubber stamp.[22] The court is limited to reviewing only the administrative record to see if it contains substantial evidence to support the City Council's decision.[23]  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker]. Substantial evidence requires more than a scintilla but less than a preponderance."[24]  Significantly, if the evidence can support one of two conclusions, the court must affirm the administrative agency's decision on summary judgment and not substitute its own judgment for that of the local board.[25]

---

[21]*Second Generation*, 313 F.3d at 627 (citing *Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1551 (10th Cir. 1996); *Am. Trucking Ass'ns, Inc. v. I.C.C.*, 703 F.2d 459, 462 (10th Cir. 1983) ("It is axiomatic that the scope of review by an appellate court of a Commission decision is a narrow one").

[22]*Id.* (citations omitted).

[23]*Second Generation,* 313 F.3d at 627-28.

[24]*Broken Arrow*, 340 F.3d at 1133 (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

[25]*Id.* (citing *Curtis, Inc. v. I.C.C.*, 662 F.2d 680, 685 (10th Cir. 1981)).

Section 332(c)(7)(B)(iii)'s substantial evidence requirement "does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.'"[26] Thus, the court looks to the requirements set forth in the local zoning ordinance to ascertain the substantive criteria to be applied.[27]   In other words, a governing body's decision to deny a request to construct a wireless telecommunications facility cannot be based on arbitrary criteria; the decision to deny must be grounded in procedural and substantive requirements specifically set forth in state and/or local law.

**D.     The City Council's Reasons for Denying Plaintiffs' Application**

As summarized by the Court, the Written Denial provides the following reasons for the City Council's decision to deny Plaintiffs' request for a special use permit:

1.     The Application is not compatible with the character of the neighborhood or the zoning and use of properties nearby.

2.     The Application would have detrimental effect on nearby property.

3.     The City's professional staff recommended denial of the Application.

4.     The Application is at odds with the Master Plan.

5.     It is unlikely the Applicant will be able to satisfy the requirements necessary to obtain a building permit.

The issue now presented is whether these reasons are supported by substantial evidence in the administrative record.

**Reason 1: The Character of the Neighborhood: Zoning and Use of Properties Nearby**

---

[26]*Broken Arrow*, 340 F.3d at 1133 (citing *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

[27]*Id.* (citation omitted).

Defendant's first reason for denial is grounded in Lenexa City Code §4-1-G-5(A) and (B), which sets forth the "character of the neighborhood" and the "zoning and use of properties nearby" as factors to consider when reviewing a proposed zoning amendment. Defendant contends the property at issue is zoned residential R-1, the property nearby is primarily zoned single family or agricultural, and the neighborhood is primarily large lot, rural residential in nature.  As such, Defendant concludes the Proposed Tower is incompatible with the character of the neighborhood, as well as the zoning and use of properties nearby.  In support of this conclusion, Defendant cites Lenexa City Code §4-1B-23EE(5), which states that "[s]ites for new installation of towers and support structures are encouraged to be as compatible as possible with surrounding land uses by avoiding locations in or near residential areas and instead locating with public and nonresidential buildings or in rear service areas, or other low visibility areas of business parks and intensely commercialized areas whenever possible."

Given (1) the Proposed Site is zoned R-1, single-family residential; (2) the area surrounding the Proposed Site is zoned single-family residential, rural residential, agricultural; and (3) Lenexa City Code §4-1B-23EE(5) encourages the City Council to avoid locating new towers in or near residential areas, the Court finds there is documented evidence in the record that a reasonable mind might accept as adequate to support the conclusion reached by Defendant with regard to the factors set forth in Lenexa City Code §4-1-G-5(A) and (B): that the Proposed Tower is incompatible with the character of the neighborhood, as well as the zoning and use of properties nearby.[28]

---

[28]*See Broken Arrow*, 340 F.3d at 1133 (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

Accordingly, the Court finds Defendant's Reason 1 is supported by substantial evidence in the record.

### Reason 2: The Application Would Have a Detrimental Effect on Nearby Property

Defendant's second reason for denial is grounded in Lenexa City Code §4-1-G-5(D), which sets forth the "extent to which the proposed use will detrimentally affect nearby property" as a factor to consider when reviewing a proposed zoning amendment. In its Written Denial, the Governing Board finds the Application will detrimentally affect nearby property because of the negative visual impact. In support of this finding, Defendant cites to the fact that Staff recommendation of denial was based, in part, upon the visual impact of the proposed tower in light of the fact that the Proposed Site is at a high point topographically in the surrounding area. Defendant also cites to Lenexa City Code §4-1B-23EE(5), which provides in relevant part that "[s]ites for new installation of towers and support structures are encouraged to be as visually unobtrusive as possible by locating near existing trees, utility poles or architectural towers, or similar elements that serve to screen or divert attention from the new support structure, and locating outside primary views along major roads."

Given (1) the Proposed Site is at a high point topographically in the surrounding area and the proposed tower is taller than the trees located on this elevated piece of property[29]; and (2) Lenexa City Code §4-1B-23EE(5) encourages the City Council to unobtrusively locate new towers (e.g., by placing them near existing trees, utility poles or architectural towers, or similar elements that serve to screen or divert attention from the new support structure), the Court finds there is documented evidence in the record that a reasonable mind might accept as adequate to support the conclusion

_____

[29]*See* Photo Simulation of Proposed Site, Exhibit A-1 to Plaintiffs' Memorandum in Support of Summary Judgment (doc. 26).

reached by Defendant: that the Proposed Tower would have a detrimental effect in terms of visual impact on nearby property.  Accordingly, the Court finds Defendant's Reason 2 is supported by substantial evidence in the record.[30]

### Reason 3: The City's Professional Staff Recommended Denial of the Application

Defendant's third reason for denial is grounded in Lenexa City Code §4-1-G-5(G), which sets forth the "recommendations of City's permanent professional staff" as a factor to consider when reviewing a proposed zoning amendment. There is no dispute that the City's professional staff recommended denial of the Application.  Accordingly, the Court finds Defendant's Reason 3 is supported by substantial evidence in the record.

### Reason 4: The Application is at Odds with the Master Plan

Defendant's fourth reason for denial is grounded in Lenexa City Code §4-1-G-5(H), which sets forth "conformance of the requested change to the adopted or recognized Master Plan being utilized by the City" as a factor to consider when reviewing a proposed amendment.  Because the Master Plan indicates single-family uses for the area at issue, the Court finds a monopole tower at the Proposed Site (which is, again, topographically a high point in the area) is at odds with the

---

[30]Plaintiffs urge the Court not to consider the visual effect of the monopole tower in a vacuum, but in the context of the effect of the monopole tower as a visual improvement over the existing guy wire tower that would be replaced.  Conversely, Defendant argues a determination of visual effect based on such a comparison is inappropriate given the existing guy wire tower is not a lawful structure.

Simply put, the Court finds the lawfulness of the existing guy wire is immaterial to a determination regarding whether substantial evidence in the record supports Defendant's conclusion that the monopole tower as proposed would have a negative visual impact on nearby property.  Thus, the Court declines to consider the visual impact of the monopole tower in the context of an improvement over the existing guy wire tower that would be replaced.  This decision is not based on a finding that the existing guy wire tower is unlawful, but based on the requirements for consideration set forth in local zoning laws.

Master Plan.  Accordingly, the Court finds Defendant's Reason 4 is supported by substantial evidence in the record.

### Reason 5: Ability to Satisfy the Requirements Necessary to Obtain a Building Permit

Defendant's fifth  reason for denial is grounded in Lenexa City Code §4-1-G-5(M), which sets forth the "ability of the applicant to satisfy any requirements (e.g., site plan, etc.) applicable to the specific use imposed pursuant to the zoning regulation" as a factor to consider when reviewing a proposed zoning amendment.  To that end, the Defendant found (1) the Proposed Site was not a legally sized lot because it did not have adequate lot frontage as required by Lenexa City Code;[31] (2) before a building permit could be issued on the lot, the Applicant would have to obtain a lot width variance from the Board of Zoning Appeals; and (3) in order to grant such a variance, the Board of Zoning appeals must find that the six conditions set forth in 4-1-K-4 of the City Code are all met, including a finding that the condition for which the Applicant seeks a variance was not created by an action of the property owner or the Applicant.  Based upon the testimony of the Applicant/property owner that the inadequately sized lot was created by the sale of the remainder of the property, Defendant concluded the Applicant likely would not be able to satisfy the requirements necessary to obtain a building permit.

Plaintiffs argue it was improper for Defendant to consider whether or not Plaintiffs would be able to obtain such a variance in considering the Application, because any conclusion reached is pure speculation. The Court disagrees.  To ignore this matter would be contrary to Lenexa City Code § 4-1-G-5(M), which specifies that the ability of the applicant to satisfy zoning and other code

---

[31]The Proposed Site, with a street frontage of only approximately 40 feet, is not a legally sized lot in the R1 zoning district, which requires a minimum lot frontage of 70 feet.

requirements should be considered when applicable to a particular application. Notably, this section of the Code does not require a finding that the applicant *will not* be able to satisfy other code requirements; only that the ability of the applicant to satisfy other code requirements is a factor that should be taken into consideration. As such, it was both reasonable, and consistent with City Code, for Defendant to consider this factor in making its decision. And, because Plaintiffs do not dispute the conditions required for a variance as set forth in 4-1-K-4 of the City Code, the Court finds Defendant's finding – that the Applicant likely would not be able to satisfy the requirements necessary to obtain a building permit – is supported by substantial evidence in the record.

## <u>Conclusion</u>

Based on the discussion above, the Court finds Defendant's decision to deny Plaintiffs' application for a special use permit to construct a wireless telecommunications facility is based on substantial evidence in the administrative record and thus does not violate the TCA. Accordingly, it is hereby ordered that Defendant's Motion for Summary Judgment (doc. 22) is granted.

It is further ordered that Plaintiffs' Motion for Summary Judgment (doc. 25) is moot as to that part of the motion that pertains to Defendant's satisfaction of the TCA's "in writing" requirement and the balance of Plaintiffs' Motion for Summary Judgment (doc. 25) is denied.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 28th day of February, 2008.

<div style="margin-left: 40%;">

s/ David J. Waxse

David J. Waxse
United States Magistrate Judge

</div>

cc:   All counsel and *pro se* parties